# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 1, 2012

## KYRIE T. ADAMS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-11-179     Roy B. Morgan, Jr., Judge**

**No. W2011-02051-CCA-R3-PC  - Filed December 11, 2012**

The Petitioner, Kyrie T. Adams, appeals as of right from the Madison County Circuit Court's denial of his petition for post-conviction relief. The Petitioner contends that he received ineffective assistance of counsel because trial counsel failed to file a motion to suppress his statement to the police prior to the Petitioner entering a guilty plea. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Mike Mosier, Jackson, Tennessee, for the appellant, Kyrie T. Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On August 9, 2010, the Petitioner pled guilty to one count of attempted first degree murder, a Class A felony, one count of especially aggravated robbery, a Class A felony, and one count of aggravated burglary, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-202, -13-403, -14-403. The Petitioner received an effective nineteen-year sentence to be served at 100 percent. At the plea submission hearing, the Petitioner stated that he understood his rights, including his right to plead not guilty and have a jury trial, and that he

understood that by pleading guilty he was waiving those rights. The Petitioner also stated that he was "satisfied" with trial counsel's representation in his case.

The State provided that had the case gone to trial, the evidence would have established that on June 2, 2009, the Petitioner "pried open" the victim's kitchen door with a crowbar. When the elderly victim entered her kitchen, the Petitioner repeatedly beat her with the crowbar until she lost consciousness and her face was "beaten almost beyond recognition." The Petitioner then "ransacked" the home and stole "five firearms." The victim called the police once she regained consciousness and "was in the hospital for an extended amount of time." The Petitioner was eventually arrested and gave a statement to the police in which he admitted entering the victim's home, beating her, and taking the guns. The Petitioner also told the police where the guns could be found. The Petitioner agreed that the State's "statement of fact [was] generally correct."

The Petitioner filed a timely, pro se petition for post-conviction relief on July 5, 2011. Counsel was appointed and an amended petition was filed alleging that trial counsel was ineffective for failing to file a motion to suppress the Petitioner's statement to police prior to the Petitioner's guilty plea. On September 19, 2011, the post-conviction court held a hearing on this matter. At the hearing, it was revealed that the Petitioner's family had hired at least four different attorneys to represent the Petitioner prior to his guilty plea. Trial counsel was the final attorney to represent the Petitioner.

At the post-conviction hearing, Angela Hopson testified that on the day the Petitioner was arrested, she was retained by the Petitioner's mother to represent him. According to Ms. Hopson, the Petitioner's mother wanted her "to go down to the jail and talk to [the Petitioner] and just explain to him . . . not to give a statement, not [to] cooperate basically." Ms. Hopson testified that when she arrived at the jail, she was told that the Petitioner "had already waived his right to counsel and didn't want counsel," so she "wasn't able to see him." Ms. Hopson actually called trial counsel to ask him for advice about what to do "because it had never happened [to her] before." According to Ms. Hopson, an officer eventually told her that the Petitioner was in the process of giving a statement and showed her a waiver of rights form signed by the Petitioner. Ms. Hopson asked the officer to inform the Petitioner that she was there and the officer refused to do so. Ms. Hopson testified that after waiting for about an hour and a half, she left.

Ms. Hopson testified that she never actually spoke to the Petitioner and never represented him in any court proceedings regarding his case. Ms. Hopson explained that the Petitioner's mother hired another attorney because she "felt that [Ms. Hopson] would need to be a witness" regarding the circumstances of the Petitioner's statement to the police. Ms. Hopson testified that the Petitioner's mother believed that there had been "a violation" of the

Petitioner's rights because she "had got him an attorney for that purpose to prevent him from giving a statement." Ms. Hopson also testified that she believed that the circumstances of the Petitioner's statement should have been "investigated further." However, Ms. Hopson admitted that, based upon her understanding of the applicable law, a motion to suppress the Petitioner's statement because she was not allowed to speak with him "would have failed."

The Petitioner testified that when he was arrested he was unaware that his mother had hired an attorney for him and that the police "didn't inform [him] of none of that." According to the Petitioner, he made two statements to the police. In the first statement he told the police that he "didn't know nothing [sic]." The Petitioner also claimed that he told the police that he "wanted an attorney." The Petitioner testified that the police continued to question him after he asked for an attorney. The Petitioner claimed that the police stopped recording their interrogation of him and then tried "to pressure [him] into talking." The Petitioner testified that "after so long, [he] told them what they wanted to hear." The Petitioner claimed that the police "pressured" him into making the second statement. The Petitioner also claimed that he signed the waiver form "afterwards of [his] second statement." However, the Petitioner admitted that he had never mentioned this claim to any of his attorneys, had never made the claim in any of his post-conviction filings, and was making the claim for the first time at the post-conviction hearing.

The Petitioner claimed that none of his attorneys "informed" him of what the State's evidence was against him. However, the Petitioner later admitted that one of his attorneys had given him all of the discovery materials for his case and had gone over the materials with him. The Petitioner claimed that he "didn't really understand" the discovery materials in his case. However, the Petitioner admitted that he never asked any of his attorneys any questions about the discovery materials because he "thought it would be [his] lawyer's job to inform [him] of the evidence against [him]" and he could ask questions about the evidence later. The Petitioner also admitted that when asked by the trial court if he had any questions, he told the trial court, "No, I ain't got no questions." The Petitioner testified that when he accepted his guilty plea, he was unaware that there was no fingerprint or DNA evidence linking him to the crime. The Petitioner testified that the police had told him "they had [] a footprint that they said matched" his shoes, but he "didn't think it matched." The Petitioner later admitted that even if he had been aware of "the strength of the State's case," he still might have pled guilty.

The Petitioner testified that his family had hired another attorney to represent him, but "she had done [sic] jumped off the case," so trial counsel was hired to represent the Petitioner. Before she left, the Petitioner had asked this attorney to file a motion to suppress his statement to the police. The Petitioner explained that he thought the motion to suppress had been filed, but at a status hearing for his case, he and trial counsel learned that it had not

been filed. According to the Petitioner, trial counsel stated at that hearing that he would file a suppression motion before the "plea cutoff deadline." The Petitioner claimed that trial counsel told him a few days before the deadline that trial counsel had not filed the motion because "he hadn't got around to it yet." The Petitioner testified that when he arrived at court on August 9, 2010, trial counsel informed him that the motion to suppress had not been filed because trial counsel "didn't get around to filing it." According to the Petitioner, trial counsel instead presented him with a plea agreement from the State.

The Petitioner testified that he felt that if the suppression motion had been filed, he would have had "a better chance of getting . . . a better plea bargain or going home." According to the Petitioner, he "didn't know what to do" because the suppression motion had not been filed. The Petitioner testified that trial counsel asked him if he was "comfortable taking a [nineteen-]year sentence," and he told trial counsel that he was not. However, the Petitioner claimed that he was "scared" that he would get "a sentence of [fifty-six] years" and that he "felt pressured," so he accepted the State's offer. The Petitioner admitted on cross-examination that he broke into the victim's house, beat her with a crowbar, and stole several guns from her. The Petitioner testified that he considered the fact that he was actually guilty when he decided to accept the State's plea agreement. The Petitioner also admitted that trial counsel negotiated a sentence that was less than half of the maximum possible sentence he faced.

The Petitioner testified that, at the time of the post-conviction hearing, he was twenty years old. The Petitioner also testified that he had received his GED and was in his first semester at Jackson State Community College when he "caught this charge." The Petitioner admitted that while this was his first "adult charge," he had been arrested several times as a juvenile. The Petitioner also admitted that he had been questioned by investigators in previous cases. However, the Petitioner claimed that he was unaware of his Miranda rights because "being questioned as a juvenile [he] never spoke because [he] always had a parent available." The Petitioner claimed that he had "never really been through the process" and that as a juvenile, he would tell the police he did not want to talk, and "they let [him] go." The Petitioner claimed that he was unaware that "they would appoint [him] a lawyer." The Petitioner admitted that he had stated at the plea submission hearing that he was satisfied with trial counsel's representation. The Petitioner also admitted that at the time of the plea submission hearing, he was actually satisfied with trial counsel's performance, but he changed his mind after he "learned later on that there could have been something different done."

Trial counsel testified that he had been licensed to practice law since 1993 and that his primary area of practice was criminal law. Trial counsel admitted that the strength of the State's case against the Petitioner was the Petitioner's statement. According to trial counsel,

-4-

the only physical evidence against the Petitioner was "a left shoe print that connected him to the scene." Trial counsel testified that the blood on the Petitioner's shoes could not be identified as the victim's "because of some type of scientific reason." Trial counsel also testified that there was no fingerprint or DNA evidence and that the victim could not identify her attacker. However, trial counsel characterized the case as "a bad set of facts" due to the victim's age and injuries. Trial counsel worried that had the case gone to a jury, there were "just so many different [worst] case scenarios." Trial counsel testified that he reviewed the discovery materials with the Petitioner and told the Petitioner that "the strongest proof against him was his statement."

Trial counsel testified that he did not file a motion to suppress the Petitioner's statement because he believed that the State "would be more inclined to move the opposite direction with [its] offer" if a suppression motion had been filed. Trial counsel testified that he researched the law on the issue and "unfortunately it didn't agree with the way the family thought it would go." Trial counsel also noted that the Petitioner could have received a sentence greater than fifty years had he been convicted at trial. Ultimately, trial counsel did not file the suppression motion because he "thought it might be adverse to [his] client's interest" and that it did not have any merit. Trial counsel characterized his decision not to file a motion to suppress as "a tactical decision to try to negotiate the best plea possible." However, trial counsel admitted that, in hindsight, he wished that he "would have filed it." Trial counsel testified that the Petitioner's testimony at the post-conviction hearing was "the first time" he heard the Petitioner mention that he signed the rights waiver after his statement.

Trial counsel testified that the Petitioner accepted the State's offer because "there were no other alternatives at the time [and] that was the most reasonable offer." Trial counsel also testified that he began negotiations with the State at twenty-five years. The State then offered twenty years and repeatedly rejected the nineteen-year offer. However, the State ultimately agreed to the nineteen-year offer. Trial counsel testified that the Petitioner's sentence was below the mid-range of the offense and was six years less than where the initial negotiations started. Trial counsel also testified that he "never had a communications problem" with the Petitioner.

At the conclusion of the hearing, the post-conviction court dismissed the petition for post-conviction relief. The post-conviction court stated that the Petitioner was intelligent, "well versed and communicate[d] well." The post-conviction court also noted that the Petitioner was "familiar with the Miranda rights" and "had been through the rights waiver before." The post-conviction court placed great weight upon the fact that the Petitioner admitted to committing the crimes and that he considered his guilt in deciding whether to accept the State's offer. The post-conviction court concluded that a motion to suppress based upon the fact that Ms. Hopson was not allowed to see the Petitioner "would not have been

successful." The post-conviction court further concluded that the Petitioner had "not carried the burden of proof" and failed to establish that trial counsel's actions amounted to ineffective assistance of counsel.

## ANALYSIS

The Petitioner contends that the post-conviction court erred by dismissing his petition for post-conviction relief.[1] The Petitioner argues that he only pled guilty "because he felt he had no other choice due to the fact" that a suppression motion had not been filed. The Petitioner further argues that "there was very little, if any, tangible evidence to present against the Petitioner at a trial"; therefore, trial counsel's failure to file a suppression motion amounted to ineffective assistance of counsel. The State responds that trial counsel "made a sound and informed tactical decision not to file the motion." The State further responds that the Petitioner was not prejudiced by the decision not to file a motion to suppress because the motion "would have been futile" and would have failed.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I,

---

[1]The Petitioner raised several other issues in his pro se and amended petitions for post-conviction relief. The post-conviction court denied post-conviction relief on these claims as well. The Petitioner has waived appellate review of the issues by not raising them in his brief. See Tenn. R. App. P. 13(b).

section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). In the context of a guilty plea, like the present case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have [pled] guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

We begin by noting that a motion to suppress based upon the police not allowing Ms. Hopson to speak to the Petitioner would have failed. See Moran v. Burbine, 475 U.S. 412, 422 (1986) (concluding that the Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights"). As such, trial counsel's failure to file a motion on grounds that would have ultimately been fruitless cannot be considered ineffective assistance of counsel. With respect to the Petitioner's claims that he was coerced into giving a statement, we note that the Petitioner was familiar with his Miranda rights and the waiver form due to his several arrests as a juvenile. Additionally, the Petitioner signed the waiver of rights form. It would be highly unlikely that a motion to suppress based upon these facts would have been successful. To the extent that the Petitioner now claims that he signed the waiver form after he gave the police his statement, the Petitioner testified that he told no one about this claim until he testified at the post-conviction hearing. Trial counsel cannot be faulted for failing to raise an issue in a motion to suppress that the Petitioner kept secret until his post-conviction hearing.

Furthermore, the Petitioner has failed to establish that but for trial counsel's failure to file a motion to suppress he would not have pled guilty and would have insisted on going to trial. Trial counsel testified that he discussed the discovery materials with the Petitioner and made him aware that his statement was the most important piece of evidence. The Petitioner testified at the post-conviction hearing that even knowing that his statement was the best evidence against him, he still may have pled guilty. The Petitioner admitted at the post-conviction hearing that he was guilty of the crimes and that he considered this fact in making his decision to plead guilty. The Petitioner faced a possible sentence of fifty-six years with twenty-five years to be served at 100 percent. When negotiations with the State began the offer was a sentence of twenty-five years. Trial counsel negotiated the sentence down by six years and below the midpoint of the sentencing range. Additionally, trial counsel believed the motion to suppress would have likely failed and would have caused the State "to move the opposite direction with [its] offer." Accordingly, we conclude that the post-conviction court did not err by dismissing the petition for post-conviction relief.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE